Slip Op. 12-134

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STATES, | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| C.H. ROBINSON COMPANY, | Court No. 06-00434 |
| Defendant. | |

**OPINION and ORDER**

[Defendant liable for unpaid duties.]

Dated: November 7, 2012

Steven M. Mager and Shelley D. Weger, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Plaintiff United States.  With them on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel was Andrew Kosegi, Deputy Assistant Chief Counsel, U.S. Customs and Border Protection, of Indianapolis, IN.

John M. Peterson and Richard F. O'Neill, Neville Peterson LLP, of New York, NY, argued for Defendant C.H. Robinson Company.

Gordon, Judge:  This opinion follows a bench trial.  Plaintiff United States (the "Government") brought this action pursuant to Section 553 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1553 (2006)[1], and 19 C.F.R. § 18.8(c), to recover certain duties, taxes, and fees from Defendant C.H. Robinson Company ("C.H. Robinson").  The court has jurisdiction pursuant to 28 U.S.C. § 1582(3) (2006).  For the reasons set forth

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

below, the court adjudges C.H. Robinson liable for the duties, taxes, and fees demanded by the United States.

## I. Background

This action involves the Government's claim that C.H. Robinson, a bonded carrier, owes duties, taxes, and fees accruing to the United States for three entries ("subject entries") of wearing apparel ("subject merchandise") from the People's Republic of China.  The subject entries were made as transportation and exportation entries, covering merchandise destined for Mexico after passing through the United States from the Port of Los Angeles, California to the Port of Laredo, Texas.

The vast majority of merchandise brought into the United States is entered by means of consumption entries by an importer of record.  A consumption entry requires that merchandise entered into the commerce of the United States meet several statutory and regulatory requirements, including the payment of duties owing upon the entered merchandise, unless the merchandise is subject to duty-free treatment.  See generally 19 U.S.C. § 1505.

As an exception to this general rule, Congress established that merchandise may be entered into the United States for the sole purpose of transporting such merchandise to a foreign port of destination.  In particular, "[a]ny merchandise . . . shown by the manifest, bill of lading, shipping receipt, or other document [such as a Customs Form 7512] to be destined to a foreign country, may be entered for transportation in bond through the United States by a bonded carrier without appraisement or the payment of duties and exported under such regulations as the Secretary of the Treasury shall prescribe."  19 U.S.C. § 1553(a).  A transportation and exportation entry ("T&E entry") is

the type of entry that is used when merchandise is transiting the United States for eventual export from the United States.   It is only when merchandise is being transported to a foreign destination and exported that duties are not owed.

Based on its clear statutory authority, U.S. Customs and Border Protection ("CBP") developed a broad regulatory scheme in which transportation and exportation entries would operate.  See 19 U.S.C. § 1553(a); see also 19 C.F.R. §§ 18.20-18.24 (2001). [2]   CBP's regulatory scheme for T&E entries is designed to ensure that merchandise destined to a foreign port of entry is, in fact, exported.   This scheme provides a multi-layered approach to overseeing such entries, including safeguards against non-compliance.  Among these safeguards is the provision found at 19 C.F.R. § 18.8(c), which requires that a "carrier shall pay any internal-revenue taxes, duties, or other taxes accruing to the United States on the missing merchandise, together with all costs, charges, and expenses caused by the failure to make the required transportation, report, and delivery."

The regulatory scheme also sets forth the timing of certain events regarding the transit of in-bond merchandise.  For example, bonded merchandise destined for export from the United States and transported by land is required to be delivered to CBP at the port of exportation within 30 days after the date of receipt by the forwarding carrier at the port of origin.  See 19 C.F.R. § 18.2(c)(2).  As a safeguard, if this requirement is not met, the regulation provides that failure to deliver the merchandise within the 30-day

---

[2] Further citations to the Code of Federal Regulations are to the relevant provisions of 2001 edition.

period constitutes an irregular delivery and the initial bonded carrier is subject to applicable civil penalties. Id. (citing 19 CFR § 18.8).

Additionally, CBP's regulations require that "[p]romptly, but no more than 2 working days, after arrival of any portion of the in-bond shipment at the port of exportation, the delivering carrier shall surrender the in-bond manifest [CF 7512] to the port director as notice of arrival of the merchandise."  19 C.F.R. § 18.7(a).  This regulation also states that"[f]ailure to surrender the in-bond manifest or report the arrival of bonded merchandise within the prescribed period shall constitute an irregular delivery and the initial bonded carrier shall be subject to applicable penalties (see § 18.8)." Id. (parenthetical in original).

Submission of a CF 7512 provides CBP with notice that the carrier has complied with the requirement of 19 C.F.R. § 18.2(c)(2) to deliver the merchandise to the port of exportation within 30 days of receipt.  It also commences the 20-day period for the carrier to notify CBP that the in-bond merchandise has not been entered.  See 19 C.F.R. § 4.37(b).  However, if the carrier chooses to enter, rather than export, the in-bond merchandise, the carrier must make that entry (for consumption, for additional movement by another carrier, or for entry into warehouse) within 20 days after arrival at the port of destination. Id.

Pursuant to 19 C.F.R. § 18.7(b), "[t]he port director shall require only such supervision of the lading for exportation of merchandise covered by an entry or withdrawal for exportation or for transportation and exportation as is reasonably necessary to satisfy him that the merchandise has been laden on the exporting conveyance." 19 C.F.R. § 18.7(b).  In late 2001 and early 2002, the time of the subject

entries, CBP used a self-regulating process at the Port of Laredo in which CBP did not require (1) a carrier to report separately its arrival at the port of destination and the carrier's exportation of the merchandise, and (2) the supervised exportation of each T&E entry.  Pl.'s Resp. to Def.'s Mot. In Limine, App. 29-30 (Dickinson Dec.), Jan. 8, 2010, ECF No. 71.  Instead, at that time, CBP gave exporting carriers the benefit of the doubt that merchandise subject to a T&E entry was exported after having merely received notice of the merchandise's arrival at the port, unless such notice was called into question.

CBP is authorized to verify the presumption of exportation it granted an exporting carrier of a T&E entry.  Pursuant to the procedures set forth in 19 C.F.R. § 18.7(c), "[w]henever the circumstances warrant, and occasionally in any event, port directors shall request the Office of Enforcement to check export entries . . . against the records of the exporting carriers.  Such check or verification shall include an examination of the carrier's records of claims and settlement of export freight charges and any other records which may relate to the transaction.  The exporting carrier shall maintain these records for 5 years from the date of exportation of the merchandise."  19 C.F.R. § 18.7(c)(emphasis added).  A bonded carrier's failure to ensure exportation or other lawful disposition of T&E merchandise exposes the carrier to liabilities for any non-delivery at the port of exportation.  See id. at §§ 18.7(c) and 18.8.  Any non-delivery of T&E merchandise is "presumed to have occurred while the merchandise was in the possession of carrier, unless conclusive evidence to the contrary is produced."  19 C.F.R. § 18.8(a); see also Assessment of Liquidated Damages Under Carrier's Bonds, 47 Fed. Reg. 2,086-01, 2,087 (Dep't of Treasury Jan. 14, 1982) (final rule).

In addition to liability for payment of liquidated damages on the bond, the bonded carrier's liability covers "any internal-revenue taxes, duties, or other taxes accruing to the United States on the missing merchandise, together with all costs, charges, and expenses caused by the failure to make the required transportation, report, and delivery." 19 C.F.R. § 18.8(c).

Here, CBP conducted an audit under 19 C.F.R. § 18.7(c) to verify whether C.H. Robinson as the bonded carrier of the subject entries exported the subject merchandise. CBP concluded that C.H. Robinson could neither show that the subject merchandise was nor otherwise account for the merchandise's whereabouts. CBP therefore presumed that the merchandise remained in the United States and determined that non-delivery of T&E merchandise had occurred for which C.H. Robinson was responsible. Accordingly, CBP made a demand on C.H. Robinson, pursuant to 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c), for payment of $106,407.86, plus interest, for duties owed on the subject entries ("CBP's duty demand"). Joint Ex. 23. CBP's duty demand explained that C.H. Robinson owed duties on the subject entries because "C.H. Robinson failed to insure that the goods were exported to Mexico" and, "[c]onsequently, the quota/visa-restricted merchandise was diverted into the commerce of the United States, resulting in the loss of duties owed to the Government." Id. CBP's duty demand advised C.H. Robinson that "this demand may be protestable pursuant to 19 U.S.C. § 1514." Id. C.H. Robinson neither protested the demand nor paid the duties demanded. This action for collection of the unpaid duties ensued.

Prior to trial C.H. Robinson moved to dismiss this case as a matter of law, denying legal liability for any duties, taxes, or fees owed on the subject entries. Def.'s

Mot. to Dismiss, Mar. 30, 2007, ECF No. 19.   In support of its motion to dismiss, C.H. Robinson argued that its responsibility for the subject entries was fully discharged when the subject merchandise was delivered to the Port of Laredo, as evidenced by the CF 7512s stamped upon arrival at that port.   Id. at 7.   C.H. Robinson contended that "any event that occurred subsequent [to delivery in Laredo] is not actionable against the carrier."   Id.   In denying C.H. Robinson's motion the court ruled that as the bonded carrier of the subject entries, C.H. Robinson fulfilled its obligations under 19 C.F.R § 18.8 by providing acceptable proof of proper delivery of the subject merchandise at the Port of Laredo, i.e., by presenting date-stamped receipt copies of the subject CF 7512s.   See Order Denying Mot. to Dismiss at 3, Nov. 20, 2007, ECF No. 32. However, the court further held that C.H. Robinson not only had to certify proper delivery, but was also responsible under the regulatory scheme to account for "missing merchandise."   Id.

The court subsequently clarified that the Government has "the burden of persuasion to establish by a preponderance of the evidence that the subject merchandise is 'missing' within the meaning of the regulation, or more simply that the merchandise was not exported as required."   Order Denying Def.'s Mot. in Limine at 2 (citing Tech Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1326-27 (Fed. Cir. 2008), Jan. 14, 2010, ECF No. 75.   Although there is a regulatory presumption that a date-stamped CF 7512 showing receipt of the in-bond manifest is acceptable proof of proper delivery, C.H. Robinson, as the bonded carrier, also had a duty to account for missing merchandise if audited under the verification procedures of 19 C.F.R. § 18.7.   Given these considerations, the court noted that the Government could not open its case in

chief "by simply resting with no proffer other than bare reliance on a regulatory requirement that Defendant account for missing merchandise." Id. at 3.  Rather, the Government would have to rebut the presumption of proper delivery by proffering "as part of its case in chief evidence of the verification procedures undertaken pursuant to [the regulatory scheme] and their results that raised suspicions about the exportation of the merchandise, leading [the court] to conclude that [the merchandise] was not exported." Id.  Depending on the efficacy of the Government's opening case, C.H. Robinson, in turn, would have to come forward with its own evidence and explanations to account for the potentially missing subject merchandise.  A bench trial followed to determine whether the Government could establish by a preponderance of the evidence that the subject merchandise was missing and therefore never exported.

In an action tried upon the facts without a jury, "the court must find the facts specially and state its conclusions of law separately."  USCIT R. 52(a)(1); see also 28 U.S.C. § 2645(a)(1).  Based on the following findings of fact and conclusions of law, the court adjudges C.H. Robinson liable for duties, taxes, and fees on the subject merchandise in the amount of $106,407.86, plus interest.

## II. Discussion

### A.  Findings of Fact

In late December 2001, Trans-Union Group Inc./Intercambio Comercial Ekim S.A. ("TUG"), the importer of record, entered the subject merchandise under cover of T&E entry numbers 609 203 744, 609 203 873, and 609 203 862 at the Port of Los Angeles.  Joint Exs. 4-6.  C.H. Robinson was designated by TUG as the bonded carrier for the subject entries.  Tr. 457:24-459:8 (Munoz direct); Joint Ex. 3; see also Joint Exs.

4-6.  At TUG's request, C.H. Robinson was to transport the subject merchandise from

the Port of Los Angeles for delivery to Intercambio Comercial Ekim SA/L.E. Forwarding

& Freight Broker in Laredo, Texas[3] using Mario's Transports Inc. ("Mario's Transports").

Tr. 459:9-24; 471:18-22; 479:9-480:2 (Munoz direct); Joint Exs. 3-4, 7-11.  Shortly after

entry, the subject merchandise exited the Port of Los Angeles for Laredo and then its

ultimate destination of Nuevo Laredo, Mexico. Pretrial Order, Schedule C (Uncontested

Facts) ¶¶ 3, 11, and 19; Joint Exs. 4-6.

     TUG employed Mario Pena, Inc. ("Pena"), a licensed U.S. customs broker, to

receive the subject merchandise in Laredo for exportation to Mexico.  See Tr. 485:14-18

(Munoz cross); Joint Ex. 4.  Pena received the T&E documents - the CF 7512s - for the

subject entries, and on January 2 and 4, 2002, using an unmonitored stamp machine in

the lobby of CBP's export lot at the Port of Laredo, obtained a date stamp showing

receipt of each of the three subject CF 7512s covering the subject entries.  Tr. 273:5-18

(Mario Pena, Jr. direct); Joint Exs. 4-6.  Pena's official log book shows a record of

receipt for the CF 7512s for the subject entries, but is blank for a corresponding date of

exportation for each entry.  Joint Ex. 13; see Tr. 271:23-272:6 (Mario Pena, Jr. direct).

Pena never brought the subject merchandise to the CBP export lot in Laredo, nor did

Pena ever see, or take possession or delivery of the subject merchandise.  Tr. 273:5-14

(Mario Pena, Jr. direct).  Morever, CBP neither physically inspected nor took possession

---

[3] No entity by the name of Intercambio Comercial Ekim SA/ L.E. Forwarding & Freight
Broker was authorized to receive bonded cargo during the time in question.  Tr. 409:18-
412:3 (Ingalls direct).

of the subject merchandise at the Port of Laredo.  Tr. 137:21-138:8 (Rodriguez direct);

Joint Exs. 4-6.

In March 2002, Officer O'Ruill David McCanlas ("Officer McCanlas") of CBP"s

Office of Investigations, Fraud and Commercial Crimes Unit commenced an audit of

C.H. Robinson, as the bonded carrier responsible for the subject entries, to ensure

compliance with CBP's procedures for T&E entries.  Tr. 25:10-24; 26:9-27:10; 41:21-

42:22 (McCanlas direct) and 51:17-20 (McCanlas cross).   In response to Officer

McCanlas' request for proof that the subject entries had been exported to Mexico,

C.H. Robinson produced a date-stamped receipt copy of the in-bond manifest – the

CF 7512 – for each of the subject entries.  Joint Exs. 4-6.  C.H. Robinson also obtained

from TUG and submitted to CBP three documents purporting to be Mexican import

documents, known as "pedimentos" ("the C.H. Robinson pedimentos" or "subject

pedimentos"), as proof of exportation of the subject entries.  Tr. 42:23-43:13 (McCanlas

direct) and 526:19-21 (Anderson re-direct); Pl.'s Exs. 9-11.

After receiving the subject pedimentos, Officer McCanlas contacted Jesus

Alberto Fernandez Wilburn ("Fernandez Wilburn"), Port Director at the Colombia

Solidarity Bridge for Mexican Customs, Nuevo Leon, Mexico, which shared operations

with the Port of Nuevo Laredo, requesting that Mexican Customs verify the authenticity

of the three subject pedimentos.   Tr. 44:20-45:9 (McCanlas direct); Pl.'s Ex. 15.

A search of Mexican Customs' electronic database revealed that the unique numbers

on each of the subject pedimentos did not match the numbers for any pedimento in

that database, nor was there any evidence of the existence of the subject pedimentos.

Tr. 328:10-329:10 (Fernandez Wilburn direct).  Moreover, the four digit broker code for

the customs broker listed on the subject <u>pedimentos</u> did not match the name of the customs broker associated with that code.   Tr. 329:20-331:2 (Fernandez Wilburn direct).   Lastly, the inspection stamps on each of the subject <u>pedimentos</u> indicated a road-check inspection in the interior of Mexico that pre-dated the purported date of entry of the subject merchandise into Mexico, Tr. 332:6-22 (Fernandez Wilburn direct), and pre-dated the date stamp signifying payment of Mexican import duties.   Tr. 335:6-14 (Fernandez Wilburn direct).

The court heard testimony from Rudolfo Torres Herrera ("Torres Herrera"), who served in various positions for Mexican Customs prior to his current appointment as the Assistant Commissioner for post imports.   He is well versed in the Mexican importation system, including the use of <u>pedimentos</u>, and was designated as an expert at trial.   Tr. 164:7-22 (Torres Herrera direct) and 206:20-207:14 (Torres Herrera direct).   He testified that on valid <u>pedimentos</u> inspection stamps must always post-date bank stamps because Mexican customs duties must be deposited with a bank prior to entry of merchandise into Mexico.   Tr. 184:14-21 (Torres Herrera direct).

Torres Herrrera also testified that, in September 2009, in response to another request from CBP to verify the validity of the subject <u>pedimentos</u>, he performed a detailed analysis of the information contained in those <u>pedimentos</u>.   Pl.'s Exs. 41-43. A search of Mexican Customs' electronic database for information on the unique <u>pedimento</u> numbers corresponding to each of the subject <u>pedimentos</u> revealed no information regarding the numbers corresponding to these three <u>pedimentos</u>. Tr. 179:13-180:2 (Torres Herrera direct).   A further search of the Mexican Customs' electronic database for the name and broker license number of the Mexican customs

broker listed on each of the pedimentos revealed that there was no broker in that database matching the name and broker license number set forth on the subject pedimentos. Tr. 181:16-182:2 (Torres Herrera direct).  That search, however, did reveal that the customs broker license number provided on the subject pedimentos belonged to a customs broker other than the broker listed on those pedimentos.  Tr. 182:2-6 (Torres Herrera direct).  Moreover, the search revealed that the Mexican Customs' electronic database had no record of a relationship between the importing company listed on the subject pedimentos and either the named customs broker or the customs broker whose license number appeared on those pedimentos.  Tr. 182:20-183:5 (Torres Herrera direct).  The results of these searches confirmed the results of CBP's March 2002 inquiry.

The Torres Herrera investigation also showed that the tax identification number – a unique number assigned to all persons or entities doing business in Mexico – listed on the subject pedimentos for the Mexican customs broker was not in the Mexican electronic taxation database.  Tr. 181:17-182:1; 183:6-184:5-7 (Torres Herrera direct). He thus concluded that the listed tax identification number was not valid.  Id.  The Torres Herrera investigation further revealed that the population registry number – a unique 18-digit number assigned to all Mexican nationals upon birth – listed for the Mexican customs broker on the subject pedimentos did not contain the required number of digits for population registry numbers and was identical to the tax identification number listed on the subject pedimentos.  Tr. 183:7-184:7 (Torres Herrera direct).  The investigation also demonstrated that the bank listed on the subject pedimentos as having received payment of the duties owed on the entries of the subject merchandise

did not engage in any transaction with the importing company listed on the subject pedimentos.   Tr. 184:8-185:11 (Torres Herrera direct).   Finally, Mexican Customs' electronic database did not contain any record of import transactions involving the importing company listed on the subject pedimentos during the period 2001-2002. Tr. 185:12-21 (Torres Herrera direct).

Torres Herrera also testified about the likelihood that cargo accompanied by the subject pedimentos could have passed legally through Mexican Customs into Mexico. According to Torres Herrera, all information listed on a pedimento is included in a bar code appearing at the center of the document, Tr. 169:18-170:8 (Torres Herrera direct), and all cargo entering Mexico must pass through a series of checkpoints where Mexican Customs visually examines each pedimento and the bar code is scanned for verification against Mexican Customs' electronic database.   Tr. 190:16-195:13 (Torres Herrera direct).   He indicated that there are three check points in the enclosed Mexican Customs' compound in the Port of Nuevo Laredo through which all truck cargo must pass upon crossing the U.S./Mexico border.   Id.   At the first inspection booth, a Mexican Customs official scans the bar code.   If the pedimento is not in Mexican Customs' electronic database, Mexican Customs would seize the subject merchandise. Tr. 191:13-24 (Torres Herrera direct).   At the second inspection booth, which is operated by a private company, the bar code is scanned again to verify the results of the first scan.   Tr. 191:25-193:25 (Torres Herrera direct).   If the pedimento is not in Mexican Customs' electronic database, the subject merchandise would be seized.   Id. At the third check point, the pedimento is visually inspected for a final time before cargo is permitted to leave the compound.   Tr. 194:2-19 (Torres Herrera direct).   Any

discrepancy or irregularity found in the <u>pedimento</u> during the three stage check-point process would lead to a physical inspection and/or seizure of the cargo, and all such inspections or seizures would be registered in Mexican Customs' electronic database. Tr. 191:13-194:14 (Torres Herrera direct); Tr. 341:12-16 (Fernandez Wilburn direct).  In addition to the three check points at the Mexican Customs' compound in Nuevo Laredo, cargo traveling by road to the interior of Mexico is subject to a fourth check point located 20 kilometers from the U.S./Mexico border.   At this fourth check point, operated by Mexican military, federal, and/or state police, each <u>pedimento</u> is examined and the bar code is again scanned.  Tr. 194:12-19 (Torres Herrera direct).  If any discrepancy is identified, the subject merchandise would be seized.  Tr. 191:13-194:19 (Torres Herrera direct).

Torres Herrera testified that, in his experience, illegal entry (smuggling) of merchandise into Mexico is most often accomplished by using <u>pedimentos</u> that, unlike the subject <u>pedimentos</u>, are valid in all respects except for the listed country of origin. He testified that in those cases, but for the country of origin, the information contained on the face of the <u>pedimento</u> would match that found in the Mexican Customs' electronic database so as to minimize the risk of suspicion during the importation check-point process. Tr. 195:17-196:17 (Torres Herrera direct).   Because the subject <u>pedimentos</u> contained numerous discrepancies that were unverifiable by a search of official Mexican electronic databases and because the subject <u>pedimentos</u> contained information whose falsity could have been ascertained by a visual inspection of a trained Mexican Customs official, Torres Herrera concluded that, in his expert opinion, the subject <u>pedimentos</u> were not valid Mexican import documents, Tr. 179:3-11 (Torres

Herrera direct), and that any cargo accompanied by these <u>pedimentos</u> could not have passed into the territory of Mexico undetected by Mexican Customs.  Tr. 190:18-195:13 (Torres Herrera direct).  Accordingly, in his expert opinion, the merchandise purported to have been imported into Mexico using the subject <u>pedimentos</u> never entered Mexico. Tr. 189:24-190:15 (Torres Herrera direct).

Pursuant to the procedures in place in 2002, Mexican Customs would have seized cargo whose <u>pedimentos</u> did not appear in Mexican Customs' electronic database.  Tr. 341:12-16 (Fernandez Wilburn direct).  While there is no evidence of the subject <u>pedimentos</u> in Mexican Customs' electronic customs database, Tr. 179:18-180:2 (Torres Herrera direct) and 328:10-329:10 (Fernandez Wilburn direct), there is also no record of a seizure of the subject merchandise by Mexican Customs.  <u>See</u> Pl.'s Ex. 15; Tr. 58:14-59:3 (McCanlas cross) and 327:8-18 (Fernandez Wilburn direct).

In response to the Government's case in chief, C.H. Robinson relied on the three date-stamped CF 7512s for the subject entries; the subject <u>pedimentos</u>; the driver hand tags and freight bills for transport of the subject merchandise; and Pena's official log book as evidence regarding the final disposition of the subject entries.  Pl.'s Exs. 19 and 22.  While C.H. Robinson demonstrated proof of delivery of the subject merchandise at the Port of Laredo, in accordance with 19 C.F.R. § 18.8(c), by submitting the three date-stamped CF 7512s, <u>see</u> Order Denying Mot. to Dismiss at 3, no information contained on the face of the three CF 7512s provides any indication of the exportation or non-exportation of the subject merchandise after its presumed arrival at the Port of Laredo, <u>see</u> Joint Exs. 4-6; Tr. 32:19-33:9 (McCanlas direct) and 87:9-89:20 (Lopez direct).  The same can be said for the driver hang tags and the freight bills for the transport of the

subject merchandise, Pl.'s Ex. 19; Tr. 90:2-92:23 (Lopez direct), and the official Pena

log book, Joint Ex. 13; Tr. 268:12-22; 272:14-24 (Mario Pena, Jr. direct).

Although C.H. Robinson made efforts to provide additional evidence of the

disposition of the subject merchandise after its purported arrival at the Port of Laredo,

those efforts proved to no avail.   In early November 2004, Gordon Anderson

("Anderson"), Vice President of C.H. Robinson's brokerage operations during the time in

question, sent an email message to Donald Munoz ("Munoz"), the account manager at

C.H. Robinson responsible for the subject entries.  Joint. Ex. 18.  In this email message,

Anderson asked Munoz to locate any records demonstrating that the subject

merchandise had been exported to Mexico.   Id.; Tr. 460:10-461:3 (Munoz direct).

C.H. Robinson's search for proof of export included attempts to locate "Customs

documents, financial receipts, Mexican carrier and or broker proof of export, paperwork

showing arrival into the plant in [M]exico, etc.[,] … documents from the truckers used[,]

[including] drivers log [and] other documentation showing delivery was made … [and]

any sort of financial trail, to include P.O.'s and method of payment and confirmation of

funds received by [the] customer for [the] transaction[,] [as well as] warehouse ledger

info, [and]  proof of delivery to receiving party … [and any information from the] party in

Mexico [who] was responsible for clearing Mexican Customs."    Joint Ex. 18.

C.H. Robinson's internal efforts failed to locate any such records or any other evidence

that the subject merchandise had left the territory of the United States.  Id.; Tr. 492:6-

493:22 (Munoz re-direct) and 526:19-21 (Anderson re-direct).

C.H. Robinson, through Munoz, contacted TUG to obtain additional proof of

exportation in 2004.  See Joint Ex. 18.  However, TUG never provided any proof (other

than the subject <u>pedimentos</u> at the time of the original transaction) to C.H. Robinson

that the subject merchandise was exported to Mexico.    Joint Ex. 18; <u>see also</u>

Tr. 491:17-20; 493:12-22 (Munoz re-direct).   C.H. Robinson was also unable to obtain a

financial trail for the subject merchandise, such as purchase orders, methods of

payment, confirmation of a funds transfer by TUG, information from a warehouse ledger

showing that the subject merchandise had shipped, documentation from the Mexican

customs broker, proof of delivery to the receiving party in Mexico or similar

documentation, showing that the subject merchandise was received in their warehouse,

nor was C.H. Robinson able to locate a record of any taxes or fees paid by TUG to its

Mexican customs broker for services of clearing Mexican Customs.   Tr. 492:11-493:11

(Munoz re-direct).    C.H. Robinson also failed to present any evidence, including a

driver's log from Mario's Transports, to demonstrate delivery of the subject merchandise

in Mexico.   Lastly, C.H. Robinson presented no evidence demonstrating that, pursuant

to Customs' regulations, another party relieved it of its responsibility to export the

subject merchandise.   C.H. Robinson never replaced or cancelled the subject entries

with immediate exportation or consumption entries.     Pretrial Order, Schedule C,

Uncontested Facts ¶¶ 8, 16, & 24.

The court notes that, throughout the five-year history of this litigation up through

the time of trial, C.H. Robinson had proffered the subject <u>pedimentos</u> (obtained from

TUG) as proof of exportation.   At trial, however, C.H. Robinson conceded that the

subject <u>pedimentos</u> were not genuine documents and could not be verified in Mexican

Customs' electronic database.   Tr. 18:18-19:24 (Peterson opening statement); <u>see also</u>

Def.'s Proposed Concls. of L. ¶ 20 ("C.H. Robinson does not deny that the <u>pedimentos</u>

were not genuine.") and ¶ 35 ("[T]he invalid <u>pedimentos</u> which C.H. Robinson presented to Customs did not constitute acceptable proof of exportation . . . .").  At that point, C.H. Robinson sought to create an inference that the subject merchandise was smuggled into Mexico.  Tr. 19:6-16 (Peterson opening statement).  Despite its efforts, C.H. Robinson presented no evidence (direct or circumstantial) that would lead to the inference that the subject merchandise was smuggled into Mexico.  To the contrary, the subject <u>pedimentos</u>, in the expert opinion of Torres Herrera, were more likely than not evidence of diversion of the subject merchandise into the commerce of the United States rather than evidence of smuggling into Mexico.  Tr. 201:19-24 (Torres Herrera direct).  Critically, the disposition of the subject merchandise after its purported arrival at the Port of Laredo remains unknown to C.H. Robinson, and C.H. Robinson presented no evidence nor anyone with personal knowledge of the whereabouts of the subject merchandise.

There is no direct evidence as to the whereabouts of the subject merchandise. However, the Government presented documentary evidence and the credible testimony of several lay witnesses, including Officer McCanlas and Fernandez Wilburn, along with the credible testimony of its expert, Torres Herrera, that allows the court to draw a reasonable, if not strong, inference that the subject <u>pedimentos</u> were not valid Mexican import documents, a fact ultimately conceded by C.H. Robinson.  The record before the court and the credible testimony of these witnesses, in particular that of Torres Herrera, further allows the inference that the subject merchandise could not have been imported into Mexico using the subject <u>pedimentos</u>.  Those <u>pedimentos</u> would not have been validated by an inspection of Mexican Customs' electronic database and would not have

passed visual scrutiny by Mexican Customs officials.  Therefore, the court finds that the subject merchandise is missing.

Additionally, the documentation that C.H. Robinson provided during the audit process to CBP, as well as at trial, did not establish (a) exportation out of the United States, (b) entry into the commerce of the United States along with payment of duties, (c) warehousing, or (d) transfer to another carrier for exportation of the subject merchandise.  The record before the court and, in particular, the credible testimony of Defendant's two witnesses, Anderson and Munoz, further demonstrates C.H. Robinson's inability to proffer, no less obtain evidence (other than the date-stamped CF 7512s and the subject false pedimentos) that accounts for the subject merchandise.  Therefore, the court finds C.H. Robinson was unable to account for that merchandise in accordance with 19 C.F.R. § 18.8(a).

## B.  Conclusions of Law

As explained above, merchandise seeking to pass through U.S. ports for export without appraisement or payment of duty is entered at the port of arrival under cover of a T&E entry.  See 19 C.F.R. § 18.20(a).  The statutory and regulatory framework imposes various responsibilities and deadlines for the handling of a T&E entry.  Among them, T&E merchandise must be transported from the port of arrival by a bonded carrier, 19 U.S.C. § 1553(a); 19 C.F.R. § 18.20(a), and must be delivered to CBP at the port of destination within 30 days of receipt by the bonded carrier at the port of arrival (if transported on land).  19 C.F.R. § 18.2(c)(2).  Within no more than two working days after arrival of any portion of the merchandise at the port of destination, the bonded carrier must notify CBP of such arrival by surrendering the in-bond manifest (CF 7512).

19 C.F.R. §§ 18.2(d) and 18.7(a).  The final disposition of the merchandise – either exportation or official entry into U.S. commerce or warehouse – must then be effected within 20 days of the notice of arrival.  See 19 C.F.R. § 4.37(b).  A bonded carrier's failure to comply with any of these procedures exposes the carrier to the liabilities set forth in 19 C.F.R. § 18.8.  See 19 C.F.R. §§ 18.2(c)(2), 18.2(d), 18.7(a), and 18.8(a); see also id. at § 4.37(b).

Additionally, a bonded carrier responsible for a T&E entry is subject to post-exportation audit by CBP "[w]henever the circumstances warrant, and occasionally in any event."  19 C.F.R. § 18.7(c).  Post-exportation audits are designed to "check export entries and withdrawals against the records of the exporting carriers" and "shall include an examination of the carrier's records of claims and settlement of export freight charges and any other records which may relate to the transaction."  Id.

When CBP determines that merchandise covered by a T&E entry is missing or unaccounted for, the non-delivery is 'presumed to have occurred while in the carrier's possession, and therefore, the carrier is treated by [CBP] as being responsible for that loss [such that CBP] will collect from the carrier duty on the missing merchandise." Assessment of Liquidated Damages Under Carrier's Bonds, 47 Fed. Reg. 2,087.

A bonded carrier's liabilities for any missing T&E merchandise include liquidated damages on the bond, 19 C.F.R. § 18.8(b), as well as "any internal-revenue taxes, duties, or other taxes accruing to the United States on the missing merchandise."  Id. at § 18.8(c).  When audited pursuant to 19 C.F.R. § 18.7, a bonded carrier's failure to account for the exportation of merchandise covered by a T&E entry is a legally sufficient basis for the imposition of duties under 19 C.F.R. § 18.8(c).  See 19 C.F.R. §§ 18.7(c)

and 18.8(c); Order Denying Mot. to Dismiss at 3.  The Government may collect duties pursuant to 19 U.S.C. § 1592(d), or alternatively under 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c).  Order Denying Mot. to Dismiss at 2-3.

The allocation of legal responsibility for the subject entries in this action is governed by the regulatory framework applicable to a T&E entry.  See Joint Exs. 4-6; see also Joint Ex. 13.  Against this framework, each subject date-stamped CF 7512 showing receipt of the in-bond manifest enjoys a presumption that it is proof of proper delivery of the subject merchandise by C.H. Robinson.  Order Denying Def.'s Mot. in Limine at 3.  However, C.H. Robinson's obligations under 19 C.F.R. § 18.8(c) go beyond the certification of proper delivery of the merchandise covered by the subject entries to include a responsibility to account for missing merchandise.  Order Denying Mot. to Dismiss at 3.  Despite C.H. Robinson's arguments to the contrary, there is no statute or regulation that imposes a burden on the Government to search for or establish the location of missing merchandise.

As the bonded carrier responsible for the subject entries, C.H. Robinson, has a duty to ensure that the subject merchandise was timely exported out of the United States or lawfully entered into U.S. commerce or warehouse.  See Order Denying Def.'s Mot. to Dismiss; see also 19 U.S.C. § 1553(a); 19 C.F.R. §§ 18.7(c) (providing for audit of "exporting carriers" (emphasis added)) and 18.8(a)).  Had C.H. Robinson wanted to expose itself only to liability for transporting the subject merchandise from one port to another, without needing to ensure the proper exportation of the merchandise, it could have done so by using an immediate transportation without appraisement entry.  See 19 U.S.C. § 1552; 19 C.F.R. §§ 18.11-18.12.  Before delivering the merchandise to

another carrier for exportation, C.H. Robinson could then have ensured that the new

carrier filed an Entry for Exportation, <u>see</u> 19 C.F.R. §18.25, making the new carrier

liable in the event that the new carrier failed to export the merchandise.   Alternatively,

C.H. Robinson could have had the merchandise entered into a warehouse or for

consumption.   <u>See</u> 19 C.F.R. § 18.23(b).   C.H. Robinson chose none of these options.

Rather, by permitting itself to remain the carrier of the subject merchandise entered

under a T&E entry, it would seem obvious that C.H. Robinson was responsible for

ensuring the exportation of the subject merchandise.   It is equally obvious that by failing

to do so C.H. Robinson made itself liable for any violations that may have occurred

relating to the exportation of that merchandise.

　　　To recover taxes, duties, and fees accruing to the United States, the Government

bears the burden to prove, by a preponderance of the evidence, that the subject

merchandise is "missing."    Order Denying Def.'s Mot. <u>in Limine</u>.    Proof by a

preponderance of the evidence requires the court, as the trier of fact, "to believe that the

existence of a fact is more probable than its nonexistence."  <u>Bosies v. Benedict</u>, 27 F.3d

539, 542 (Fed. Cir. 1994) (citing <u>In re Winship</u>, 397 U.S. 358, 371-72 (1970) (Harlan, J.,

concurring)).

　　　In this action the Government has established that the subject merchandise is

missing, and C.H. Robinson, in turn, has failed to account for that missing subject

merchandise.   The court concludes on the record before it that it is more probable than

not that the subject merchandise was not exported, as required by statute and

regulation.   Consequently, pursuant to 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c),

C.H. Robinson is liable for "any internal-revenue taxes, duties, or other taxes accruing to the United States" on the missing subject merchandise in the amount of $106,407.86.

### III. Conclusion

For the foregoing reasons, the Government has established that C.H. Robinson did not export or otherwise account for the subject merchandise and that the Government is therefore entitled to a judgment for unpaid duties on the subject entries in the amount of $106.407.86, plus interest.  In early March 2004, C.H. Robinson paid CBP $57,212 as settlement of the liquidated damages claims related to the subject entries.  Comp. ¶ 15.  Subsequently, the Government admitted that the maximum amount of liquidated damages owed by C.H. Robinson was capped at the amount of the bond on the subject entries, i.e., $25,000.  Id. at ¶ 18; see also C.H. Robinson Int'l v. United States, 64 Fed. Cl. 651, 660 (2005)  Consequently, in seeking its requested relief, the Government acknowledges that a judgment in its favor should be offset by any overpayment in liquidated damages by C.H. Robinson on those entries.  Comp. at Prayer for Relief.

Additionally, the Government seeks pre-judgment interest on the unpaid duties. The award of pre-judgment interest is within the sound discretion of the court based on considerations of equity and fairness.  See United States v. Imperial Food Imports, 834 F.2d 1013, 1016 (Fed. Cir. 1987) (citing United States v. Goodman, 6 CIT 132, 140-41, 572 F. Supp. 1284, 1290 (1983)).  The purpose behind pre-judgment interest is to make the Government whole by reimbursing it for what in effect amounts to an interest-free loan to Defendant.  Id.  Pre-judgment interest shall run from the date of Customs' final demand for payment, September 21, 2006, to the date of judgment, see United States

v. Yuchius Morality Co., 26 CIT 1224, 1240-41 (2002), at the rate provided in 28 U.S.C.

§ 2644 and in accordance with 26 U.S.C. § 6621, see United States v. Golden Gate

Petroleum Co., 30 CIT 174, 182-83 (2006) (citing Goodman, 6 CIT at 140, 572 F. Supp.

at 1290).   In this action, there has been no unreasonable delay on the part of the

Government, and therefore, equity favors awarding the Government pre-judgment

interest to compensate the Government for the loss of use of the unpaid duties.  Finally,

the Government is awarded post-judgment interest based on the same considerations

of equity and fairness and shall be calculated at a rate in accordance with 28 U.S.C.

§ 1961.  See Golden Gate Petroleum, 30 CIT at 183 n.9 (citing Goodman, 6 CIT at 140-

41, 572 F. Supp. at 1290).  Accordingly, the parties are hereby

**ORDERED** to file, on or before November 20, 2012, a joint proposed judgment in

conformity with this opinion taking into account any overpayment in liquidated damages

by C.H. Robinson on the subject entries; and it is further

**ORDERED** that if the parties are unable to reach agreement on a joint proposed

judgment, each party shall file its own proposed judgment on or before November 20,

2012.


                                                          /s/ Leo M. Gordon
                                                         Judge Leo M. Gordon



Dated: November 7, 2012
           New York, New York